John E. Palmer filed this suit against Marcel G. Gelpi, a real estate agent, claiming $325 because of defendant's alleged breach of a contract under which it is charged that the said defendant agreed to sell for plaintiff, for a stipulated price of $100 each, five lots of ground owned by plaintiff. It is alleged that the lots are worth $25 each and that therefore defendant is liable to plaintiff for the difference between $25 each and the $100 each which defendant guaranteed would be paid for them, less, of course, a commission of 10%, or $50, which plaintiff admits was provided for in the contract. By supplemental petition Palmer alleged that he appears as the agent and attorney in fact of his wife, Mrs. Lillian Sutherland Palmer, and that he inadvertently failed to set forth this fact in the original petition.
Gelpi admitted that he had made a written agreement concerning the sale of said property but averred that he had merely agreed to use his best efforts to obtain the desired price. He further contended that he did not agree to sell the property for Mrs. Palmer but expressly agreed to sell it for Mr. Palmer and he contended also that at no time could the property have been delivered even if a purchaser had been procured for several reasons: first, that the property was encumbered with an uncancelled mortgage; second, that it had been adjudicated to the state for taxes, and third for the reason that it had not been subdivided as defendant contends it must be subdivided before it can be sold in lots.
Defendant also contends that as a matter of fact the property actually belongs to the community existing between Mr. and Mrs. Palmer and that therefore any suit for breach of a contract to sell it, or any part of it, should have been brought by Mr. Palmer as head of the community and not by him as agent for his wife.
There was a judgment below dismissing the suit and plaintiff has appealed.
The record shows that during the year 1935 Palmer was approached by a salesman of Gelpi who attempted to sell to him a certain unit of land containing twenty-five lots in what is called Pontchartrain Gardens Subdivision in Jefferson Parish, and that Palmer, either for himself or for his wife exhibited interest but would not, at first, consummate the deal. It appears that then Gelpi, himself, took up the negotiations and painted a glowing picture of the value of the lots saying that similar property was reselling at a much higher price. It also appears that in order to induce Palmer to reach a conclusion, Gelpi agreed that if the lots were purchased he would "guarantee" to resell five of them at $100 each, and that this had the desired effect. Thereafter Gelpi prepared a written document in which he stated the following: "I agree to sell for your account, in consideration of your giving me a contract for the sale of the property on which you have made an offer to purchase * * * not less than two inside lots at a minimum of $100.00 per lot within one year from date of act of sale and three inside more lots at a minimum of $100.00 per lot within eighteen months from date of sale or a total of five lots."
When Gelpi presented this document to Palmer, he objected to it on the ground that it did not contain the guarantee which Gelpi had offered. Thereupon Gelpi wrote another document in which he said: "I agree to dispose of, for you, two (2) lots, each 25 x 150, at a minimum of One Hundred Dollars ($100.00) per lot, within twelve (12) months from the date of your Act of Sale; and three (3) lots, each 25 x 150, at a price of One Hundred Dollars ($100.00) each, within eighteen (18) months from the date of your Act of Sale, the total of these five (5) lots to be sold from the inside of your property." *Page 61 
Again Palmer objected on the ground that the document did not contain the guarantee, and then Gelpi, in his own handwriting, inserted the necessary words to make the first part of that document which we have quoted read as follows: "In consideration of the above purchase I agree and guarantee to dispose of, etc."
Palmer accepted this letter, writing at the bottom: "Accepted: J.E. Palmer" and then he delivered to Gelpi the signed offer to buy the unit of property. He had signed it as follows: "Mrs. Lillian Sutherland Palmer, Per J.E. Palmer, Attorney." On behalf of the vendor Gelpi accepted this offer and shortly thereafter Mrs. Palmer took title to the property from the prior owner of the land, Investment Securities, Inc. Mrs. Palmer bought the property for $625, paying $100 in cash and granting a vendor's lien and mortgage for the balance, $525.
Gelpi did not sell any part of the land and there was correspondence between Gelpi and Palmer in none of which did Gelpi contend that his only obligation was to use his best efforts to sell the property. Finally on May 13, 1937, Palmer wrote to Gelpi calling his attention to the "guarantee" and referring to the fact that he had agreed in the event of failure to sell the lots to a client, to purchase them himself. In this letter Palmer stated that the president of the Land Company, on behalf of Gelpi, had requested "an extension of six months from the date of the original guarantee", and he advised Gelpi that he would grant him that extension, that is to say, until October 15, 1937. In this letter Palmer also said: "It is to be distinctly understood that if five inside lots in each unit are not sold by you for the price and sum of $100.00 each, by October 15th, 1937, that you are then to purchase the lots for that price and take title to them within a reasonable time (thirty days) thereafter."
The second unit referred to by Palmer was another unit which he had bought but concerning which it now develops Gelpi had not given a guarantee.
In answer to this letter Gelpi, on May 20, 1937, wrote to Mr. Palmer saying: "I have always cooperated with my clients and with this viewpoint I reiterate the terms and conditions as set forth in my letter to you * * * dated September 11th, 1935. I appreciate the offer of extension of six months to carry out my agreement."
It is to be noted that Gelpi made none of the objections which he now presents in this suit and merely thanked Palmer for the extension made and, in effect, agreed to proceed under the original contract.
As we have already said, Gelpi now presents several contentions; first, that the letter did not contain a guarantee at all but should be interpreted merely as an agreement that he would use his best efforts to dispose of the property.
It is very evident that the said letter containing the word "guarantee" cannot be dissociated from the agreement to purchase. If that letter stood alone the word "guarantee" might possibly be given some such meaning as is contended for by defendant. If the lots were already owned and the owner employed Gelpi as an agent to sell them, there would, of course, be no reason whatever for him to assume possible financial responsibility, but it must be remembered that it was to induce a hesitant purchaser to act that the letter was written. It was only on the fact that a guarantee to sell five lots for $500 was made that the offer to purchase was accepted. The negotiations between the original offer to guarantee and the final placing of that offer in writing show plainly that the parties understood definitely and positively that Gelpi was to do much more than merely use his best efforts to sell the property.
Gelpi's second contention is that his agreement was a personal one with Mr. Palmer and that he at no time agreed to sell the lots for Mrs. Palmer. Palmer says that at all times Gelpi knew that he was negotiating for his wife. Whether that was known by Gelpi or not, it is very obvious that there was nothing personal about the guarantee. There was no reason which would have prompted Gelpi to guarantee to Palmer anything more than he would have been willing to guarantee to Mrs. Palmer, and since we think that the two contracts must be viewed together, it would be absurd to conclude that though Mrs. Palmer was the purchaser of the lots as is evidenced by the agreement to buy, it was to Mr. Palmer alone that Gelpi gave the guarantee that he would obtain a purchaser.
The fact that the property had been adjudicated to the state for taxes is, we think, of no importance. The question *Page 62 
is: Could Mrs. Palmer have made title to the property had a purchaser been presented, and we think that she could. There always remained the right to redeem and, in fact, later the property was redeemed. In such a situation it must be presumed that had a prospective purchaser appeared the owner would have effected the redemption. The same may be said of the mortgage. Had a prospective purchaser appeared surely the owner could have obtained a release of the lots by making payment to the mortgage holder of the amount received for the lots or so much thereof as might have been necessary. At any rate, had any person agreed to buy he could not have receded from his bargain until it developed that the prospective vendor could not obtain a release of the mortgage or could not redeem the property. In Richardson v. Charles Kirsch Co., et al., 189 So. 146, 152, we said:
"* * * it is well settled that, where there are conventional mortgages against property which forms the subject of a contract of sale, this is no legal justification for refusal to accept title where the total amount due on those mortgages is less than the price at which the property is to be sold.
"`As to the incumbrance, it is well settled that a mortgage on the property forms no legal justification for refusing to accept title where the price agreed to be paid for the property is more than sufficient to satisfy the mortgage debt. Grimshaw v. Hart, 6 Rob. 265; Kinberger v. Drouet, 149 La. (986), 999, 90 So. 367; Murphy v. Hussey, 117 La. 390, 41 So. 692.' Jaenke v. Taylor,160 La. 109, 106 So. 711, 714. See, also, Lomel Realty Corporation v. Chopin, 177 La. 474, 148 So. 683."
But, as we have already shown, none of these contentions was raised when Gelpi was called upon to carry out his agreement. He did not say that he could not do so because of the tax sale, nor did he refer to the mortgage, nor to the fact that there had been no proper subdivision of the lots, nor did he say that the guarantee was personal. He merely sought and obtained an extension, promising to carry out his agreement if given time, and then failed to do so.
It is shown by plaintiff that under date of October 2, 1940, Mr. George Piazza, attorney for plaintiff, and a Notary Public, sent a registered letter to Gelpi, reading as follows:
"You are hereby notified that I have prepared an act of sale from Mrs. Lillian Sutherland Palmer to yourself conveying to you five (5) inside lots in Section `C', Block 15, Unit No. 1, Pontchartrain Gardens Subdivision, Jefferson Parish, Louisiana, for the sum and price of One Hundred Dollars ($100.00) each, in accordance with your contract dated September 7th, 1935.
"Mrs. Palmer will be ready to transfer these lots to you in my notarial office on Monday, October 7th, 1940, at 2:30 o'clock P.M., upon you paying the agreed purchase price."
Mr. Piazza testified that he waited in his office at the appointed time but that Gelpi failed to appear, although "Mrs. Palmer was there willing and able to transfer the property to Mr. Gelpi."
We now consider the contention that Gelpi could not have sold the property because it would have been unlawful to sell lots out of a larger tract which had not been formally subdivided. This contention is based on Act 51 of 1930, which provides that wherever the owner of a tract of land desires to sell any part of it in lots "it shall be the duty of such owner or owners of such real estate, before selling any * * * lot * * * to cause said real estate to be surveyed and platted or subdivided * * *." The Act provides that failure to comply with these terms shall be a misdemeanor, and it prohibits the registration of any deed to any such lot until the provisions of the act have been complied with. This statute takes the place of and repeals two earlier statutes, Act 134 of 1896 and Act 80 of 1922 which required that certain formalities must be complied with before a tract of land could be laid off and subdivided and sold as lots.
It appears that the requirements of the Act of 1930 have not been complied with in so far as the property here involved is concerned. Gelpi points to this fact and contends that because of it he could not have sold the lots for plaintiff. In Stafford, Derbes Roy, Inc., v. DeGruy, 172 La. 160, 133 So. 430, the Supreme Court, in considering the two earlier statutes, held that since the owner corporation had not complied with them, it could not compel the defendant who had agreed to buy lots in the subdivision to make the stipulated payments. But the facts here are sufficiently different to justify a different conclusion. *Page 63 
While it is true that ignorance of the law excuses no one and that therefore plaintiff must be presumed to have known the law, there is no presumption as to his knowledge of the facts. And Palmer testified that he had no idea that the property had not already been subdivided and that only long afterwards was he so advised by Gelpi. He was justified in believing that the property had already been subdivided for all of the various negotiations are shown to have been concerned with "lots". When he bought the property it was stipulated that there were certain restrictions concerning buildings on certain streets. This indicated that the property had been subdivided. The contract on which this suit is based contemplates the sale of "lots." At any rate, Gelpi was better acquainted with the fact that the property had not been subdivided than was Palmer, and under the maxim already referred to he, too, is bound to have known of the necessity for formally effecting the subdivision. It was his duty, as the agent who sold plaintiff the property and the agent who guaranteed to sell the lots, to advise that the subdividing had not been done and that it must be done before the lots could be sold. He did not so advise and, when called upon to carry out his contract, did not raise this question at all. It may well be that had he told plaintiff of the necessity, the requirements of the statute would have been immediately complied with.
We think that Gelpi is liable because of his breach of the contract under which he guaranteed that he would dispose of five lots at $100 each.
What then is the amount to which plaintiff is entitled as a result of that breach? Defendant should be treated as though he has breached a contract to purchase because though his primary obligation was to sell the lots to some one else, his secondary obligation was to take them himself if he could not procure a purchaser. He did not procure a purchaser, therefore his obligation was to take them himself and this he failed to do. In Mutual Rice Co. of Louisiana v. Star Bottling Works, Ltd.,163 La. 159, 111 So. 661, 663, the Supreme Court said: "* * * When a buyer breaches the contract of sale, the measure of damages which the seller is entitled to is the difference between the price stipulated in the contract and the market price at which the goods can be readily sold at the time and place of delivery; * * *." This rule is based on Article 2565 of our Civil Code.
By the testimony of Gelpi it is shown that there was no market price for such lots at the time at which he failed to comply with his agreement. On this point the district judge himself interrogated Gelpi:
By the court:
"Q. Did you sell any lot at retail approximately two years after the date of the sale? A. No, I was trying to get the whole property together.
"Q. Was there any retail sale at all made around that period? A. No, sir.
"Q. Two years after this sale? A. No, sir.
"Q. Anybody else made a sale? A. No, sir.
"Q. Is there any way of determining the value of the lots at retail? A. The only way is to offer it today and I didn't offer it at retail. * * *"
Because there was no market for such lots at that time it may well be that the true value was even less than plaintiff paid for the property. But it is conceded by plaintiff that the value was $25 per lot. Therefore the amount for which defendant is liable is the difference between $25 per lot and $100 per lot, or $375, less, of course, the commission to which defendant would have been entitled had he made the sale to some one else. This commission would have been $50 — therefore, there should be judgment against him for $325, with legal interest from judicial demand.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed and that there be judgment in favor of Mrs. Lillian Sutherland Palmer and against Marcel G. Gelpi in the full sum of $325, with legal interest from judicial demand and for all costs.
Reversed. *Page 64